UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------

JAMES MCKENNA,

<div style="margin-left:2em">Plaintiff,</div>

<div style="margin-left:2em">-against-</div>

FORWARD INDUSTRIES, INC., a New York
Corporation; FRANK LAGRANGE JOHNSON;
ROBERT GARRETT; OWEN P.J. KING;
TIMOTHY GORDON; and JOHN F. CHISTE,

<div style="margin-left:2em">Defendant.</div>

----------------------------------------------------------------



14 CV 6944

Civil Action No.

COMPLAINT

DEMAND FOR JURY TRIAL

RECEIVED
AUG 2 6 2014
U.S.D.C. S.D. N.Y.

Plaintiff James McKenna, ("McKenna" or "Plaintiff"), through his undersigned counsel, hereby asserts as his Complaint against Defendants, Forward Industries, Inc. ("Forward" or the "Company"), Frank LaGrange Johnson, Robert Garrett, Owen P.J. King, Timothy Gordon and John Chiste (collectively, "Individual Defendants") as follows:

### NATURE OF THE ACTION

1.      This case involves the breach by Forward of its employment contract with McKenna. After successfully serving as the Company's Controller since 2003, McKenna was selected as the Company's Chief Financial Officer ("CFO"), Treasurer and Assistant Secretary in 2008. (A true and correct copy of the Amended Employment Agreement in attached hereto as Exhibit A.) McKenna diligently and faithfully served that position until August 19, 2014, when he was wrongfully terminated by the Company out of the pretext that there was "cause" to do so when in fact none existed. The question of "cause" was a thinly veiled pretext to cover the real reason for termination: retaliation against McKenna for blowing the whistle on alleged illegal and improper conduct of the Individual Defendants.

2.     Defendants, Frank LaGrange Johnson ("Johnson"), Robert Garrett ("Garrett"), Owen P.J. King ("King"), Timothy Gordon ("Gordon"), and John F. Chiste ("Chiste") are members of the Company's Board of Directors (the "Board"). Johnson is the Chairman of the Board, and Garrett is the Company's Chief Executive Officer ("CEO").

3.     Since 2012, McKenna has been purposefully hindered in performing his duties to Forward as CFO. In addition, there have been several violations of Forward's Code of Business Conduct and Ethics that McKenna was obligated to report under the Code. In an effort to stifle McKenna's obligations, a trumped-up reason for termination was created to avoid liability. However, as set forth in greater detail below, McKenna made numerous demands for corrective action to Garrett, Forward's CEO, most of which were ignored.

4.     Defendants, who constitute a majority of Forward's Board, have been pursuing a ruinous course of underhanded and reckless corporate action, including a number of questionable related-party transactions involving insider Defendants, and improper conduct by the individual defendants relating to a pending imminent acquisition with a third party which defendants have failed, and continue to fail, to disclose despite a duty to do so, all of which was undertaken against the advice of McKenna, or without informing him. McKenna has made numerous attempts to discuss these matters with the CEO and Board but has been rebuffed every step of the way. In retaliation for McKenna's attempts to control and cure Forward's misconduct, Forward terminated McKenna's employment and fabricated lies about him to discredit him.

5.     Moreover, Defendants have created a special committee that has the purpose of ridding the Company of Terence Wise ("Wise"), a Board member who owns 19.6% of the company's common stock and is the Company's largest shareholder. In pursuit of this scheme, Defendants, acting through their special committee, sought to issue a new series of Series B

Senior Convertible Preferred Stock (the "2014 Series B Preferred Stock") to unidentified investors at below market value, in direct response to Wise's decision to nominate directors for election at the 2014 Annual Meeting.  The 2014 Series B Preferred Stock would be convertible into shares approaching 20% of the Company's outstanding common stock, per the corrected application filed, and would therefore significantly dilute the Company's existing shareholders. The 2014 Series B Preferred Stock would further be issued at a 10% discount to market price of common stock, despite having features such as 6% dividend, conversion and liquidation rights.

6.      In furtherance of this scheme, Johnson and his supporters on the Board first caused an application and affirmation statement (together, the "Application") to be falsely signed and filed with NASDAQ in McKenna's name, falsely using McKenna's NASDAQ credentials, without McKenna's knowledge or authorization.

7.      The Application was filed with NASDAQ on July 8, 2014 and stated that the Series B Preferred Stock would be issued on July 17, 2014.

8.      The Application was misleading and inaccurate in certain material respects, including the representation that it was submitted with Board approval when it was not. Specifically, the Application contained the date of a Board meeting that was never held.

9.      After McKenna reported the forgery to the Board, his NASDAQ account was again hacked and his credentials were again used without his permission to withdraw the Application.

10.     McKenna demanded an immediate investigation of this matter by the Board. However, the Board never provided a written response to the reported fraud and never performed a full investigation of the alleged wrongdoing.[1]

11.     McKenna blew the whistle on July 9, 2014.  His action in reporting the fraudulent Application is not only strongly encouraged by federal and state law, including the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd Frank Act" or "Dodd Frank"), the Sarbanes Oxley Act of 2002 ("SOX"), and analogous state statutes, and by Section 16 of Forward's own published Code of Business Conduct and Ethics, "Reporting any Illegal or Unethical Behavior."  (A true and correct copy of the Code of Business Conduct and Ethics is attached hereto as Exhibit B.)  Contrary to its own policies and procedures, the Company did nothing to investigate McKenna's July 9, 2014 report of the fraudulent Application.[2]  It did, however, embark on a well-orchestrated campaign of retaliation to discredit McKenna internally and externally that culminated in McKenna's dismissal on August 19, 2014 in breach of the Employment Agreement and in direct violation of the Company's own Code of Business Conduct and Ethics.

12.     In the month following the reporting of the fraud, McKenna was harassed by Garrett for following the Company's Code of Business Conduct and Ethics and reporting the NASDAQ forgery to the Board.  Garrett told McKenna that he and the Board are now "unwilling to share information" with him because there is a "lack of trust" and he is not a member of the team.  McKenna was further threatened by Chiste with the "destruction" of his "professional

---

[1] As explained in further detail below, the Company did engage a law firm to "investigate" the fraud on or about August 18, 2014.  However the investigation was not initiated until after McKenna refused to sign a fraudulent auditor's letter in connection with the Company's Form 10Q.  Even then, the investigation lasted no more than an hour and was calculated from the beginning to conclude that there was no fraud.

[2] See FN 1.

career" if he should fail to follow Garrett's instructions, regardless of the legality of those instructions.

13.    On August 19, 2014, counsel for McKenna, through counsel for Defendants, sent a letter to the Company's Board detailing some of the corporate wrongdoing that has violated the Company's Code and made it difficult for McKenna to execute his fiduciary duties to the Company.  (A true and correct copy of that letter is attached hereto as Exhibit C.)  In that letter, McKenna's counsel gave the Company five (5) days to correct the conduct before McKenna would pursue legal action.

14.    On August 19, 2014, the Company followed through on its threats and McKenna was wrongfully terminated in retaliation for blowing the whistle on the alleged illegal and unethical conduct of Defendants.  However, as was the Company's plan in refusing to communicate with McKenna about revising the auditor's letter associated with the Form 10Q filing, the Company's pretextual reason for firing him was McKenna's refusal to sign the auditor's letter of representations and certify Forward's Form 10Q for the period ended June 30, 2014.  (Attached hereto as Exhibit D is a true and correct copy of the termination letter, dated August 19, 2014.)  However, McKenna refused to sign the Auditor's representation letter because it included affirmations McKenna knew or suspected were false.  In the week preceding the August 19, 2014 due date for the Company's 10Q, McKenna repeatedly attempted to have the language revised and offered to discuss framing a truthful letter with the auditors.  However, because this was part of the scheme to create a pretextual reason to wrongfully terminate McKenna, his requests were ignored.  Moreover, on August 19, 2014, McKenna became aware of communications with the SEC when he discovered it in a bill.  In the last version of the

auditor's letter, McKenna was asked to represent that there had been no communications with the SEC.

15.    In an effort to discredit McKenna, and as a clear indication of the pretextual nature of the Company's purported "cause" for terminating McKenna, on August 21, 2014, the Company filed a Complaint against McKenna seeking "declaratory relief confirming the rightful termination for cause of the employment of" McKenna.  (A true and correct copy of the Complaint, Index No. 158237, is attached hereto as Exhbit E.)  In the Complaint, the Company makes ridiculous accusations about McKenna's character in an attempt to fabricate the "cause" for which he was fired.  Incredibly, the Company claims that McKenna's reporting of the alleged fraud in connection with the Application was "harassment" of the Board.  None of the facts support the Company's allegations in its Complaint.  Further, that the Company's lawsuit was retaliatory is reinforced by the fact that it was filed in response to McKenna's counsel's threat of litigation and only seeks a declaration that the Company did not breach the employment contract.

16.    In this action, McKenna seeks redress for the blatant and unlawful retaliation leading up to and including his wrongful termination, the impermissibility of the termination under his contract with the Company, and the devastating impact all this has had on what was, until now, McKenna's unblemished and highly respected career.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims asserted herein arise under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1).

18.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

19.     Venue is properly laid in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred within the County of New York and State of New York, within the Southern District of New York.  Moreover, the Amended Employment Agreement between the Company and McKenna is governed by New York law and provides that disputes arising under the agreement "shall be submitted to the exclusive jurisdiction of any state or federal court in the State of New York or in the State of Florida."

## PARTIES

20.     Plaintiff James McKenna is the former Chief Financial Officer and Treasurer of Forward.  McKenna resides in Jupiter, Florida.

21.     Defendant Forward is a corporation organized under the laws of the State of New York, with its principal place of business at 477 Rosemary Avenue, West Palm Beach, Florida, and with its New York offices located at 570 Lexington Avenue, New York, New York. Forward is a public company the shares of which are listed and traded on the NASDAQ Stock Market under the ticket symbol: FORD.

22.     Defendant Frank LaGrange Johnson ("Johnson") is a natural person who resides and maintains his principal place of business in New York, New York.

23.     Defendant Robert Garrett ("Garrett") is a natural person who resides and maintains his principal place of business in New York, New York.

24.     Defendant Owen P.J. King ("King") is a natural person who resides and maintains his principal place of business in New York, New York.

25.     Defendant Timothy Gordon ("Gordon") is a natural person who resides and maintains his principal place of business in New York, New York.

26.    Defendant John F. Chiste ("Chiste") is a natural person who resides and maintains his principal place of business in Florida.

## FACTS

## MCKENNA'S EMPLOYMENT WITH THE COMPANY IS GOVERNED BY AN AMENDED EMPLOYMENT AGREEMENT

27.    McKenna was employed as Forward's CFO, Treasurer, and Assistant Secretary since January 2008.  Prior to that time, he served as Forward's Controller since December 2003.

28.    McKenna's employment commenced pursuant to an Employment Agreement dated as of August 10, 2010.  On or about April 1, 2011, McKenna and the Company entered into an Amended Employment Agreement.  (See Exh. A.)  The initial term of the Amended Employment Agreement was through December 31, 2012, subject to automatic renewal on a yearly basis thereafter.

29.    On August 19, 2014, the Company terminated McKenna "for cause," purportedly under Section 4(a)(i) of the Amended Employment Agreement, "based upon, but not limited to, [McKenna's] willful misconduct in connection with the performance of [his] duties under the Employment Agreement and [his] actions in violation of [his] fiduciary duty owed to the Company in connection with the preparation and filing of the Company's Form 10Q for the period ended June 30, 2014."  (See Exh. D.)

30.    The Amended Employment Agreement, Section 4(a)(i), allows the Board to "terminate the employment of Executive for cause," with "cause" meaning Executive's:

> (i) Willful misconduct in connection with the performance of any of his duties or services hereunder, including without limitation (1) misappropriation or improper diversion of funds, rights or property of the Company or any subsidiary of the Company ("Subsidiary"), or (2) securing or attempting to secure personally (including for the benefit of any family member, or person sharing the same household, or any entity (corporate, partnership, unincorporated association, proprietorship, limited liability company, trust or otherwise) in which Executive

has any economic or beneficial interest) any profit or benefit in connection with any transaction entered into on behalf of the Company or any Subsidiary unless the transaction benefiting the entity has been approved by the Board upon the basis of full disclosure of such benefit, or (3) material breach of (x) any covenant contained in this Agreement or (y) the Company's Insider Trading Policy or Code of Business Conduct and Ethics, as in effect from time to time, or (4) any other action in violation of Executive's fiduciary duty owed to the Company or Executive's acting in a manner adverse to the interests of the Company and for his own pecuniary benefit or that of a family member (or member of his household) or any entity (as described in clause (i)(2) of Section 4(a) above) in which he or any such person has an economic or beneficial interest; or (5) Executive's failure to cooperate, if requested by the Board, with any investigation or inquiry into his or the Company's business practices, whether internal or external…"

31.     However, as set forth in further detail herein, the Company breached its Employment Agreement with McKenna by purporting to terminate McKenna's employment "for cause" when in fact no such "cause" existed, either as that term is defined in the Employment Agreement or otherwise.

**Defendants' Improper Actions Hindered McKenna's Ability to Perform His Duties As CFO of Forward**

32.     Since 2012, McKenna has been purposefully hindered in performing his duties to Forward as CFO.  In addition, there have been several violations of Forward's Code of Business Conduct and Ethics that McKenna was obligated to report under the Code.  McKenna made numerous demands for corrective action to Garrett, Forward's CEO, most of which were ignored.

33.     The following are instances of wrongdoing by Defendants that have impeded McKenna's ability to perform the duties of CFO of Forward and/or violated the Company's Code and illustrate the reasons for its retaliation against McKenna:

a.     In 2012-2013, the Board authorized Johnson's request to invest $2 million of the Company's money (representing approximately 15% of the Company's market capital) in "Project Leucadia," which was under the control and management of Johnson's private

investment vehicle, LaGrange Capital Administration, LLC ("LaGrange Capital"), for which Johnson receives a 1% asset-based fee and a 20% performance fee. McKenna was excluded from the decision to invest the funds and all discussions related to investment strategy. The Investment Committee recommended and the Board approved investment parameters for Johnson's project on multiple occasions, all of which were ignored. After McKenna reported violation of the parameters to the Board, the Investment Committee set additional parameters and required daily monitoring of the portfolio and daily certification of Johnson that he was in compliance. Indeed, the investment strategy employed by Johnson was extremely high risk and involved option trading, concentrations, and extremely high volumes of trading. However, despite the fact that Johnson ignored all of the parameters set by the Board and ultimately lost nearly $800,000 of the $2 million invested, the fund was not terminated, nor was any legal action brought against Johnson.

b.  In 2013, Johnson executed an agreement with Advanced Discovery to preserve the Company's email data and files in connection with the lawsuit, *Targus Group International, Inc., et al. v. Forward Industries, Inc., Johnson, et al.*, filed in Orange County Superior Court. Johnson failed to timely notify or send a copy of the agreement with Advanced Discovery to McKenna, which resulted in $155,000 of unaccrued expenses, and a material weakness in the Company's internal controls.

c.  In the summer of 2013, McKenna was summarily excluded from all discussions related to a convertible preferred stock issuance (the "2013 Convertible Preferred Stock Issuance"). McKenna was excluded from providing input on the terms of placement, as well as the valuation of the 2013 Convertible Preferred Stock Issuance. Ultimately, Defendants caused the Company to issue a new series of voting 6% senior convertible preferred stock to private

investors, including Johnson, Gordon (a former LaGrange Capital partner) and Gordon's father.

Johnson, Gordon, and Gordon's father are all insiders with aggregate ownership of the total

placement.  As a result of this issuance, Johnson, Gordon and the other preferred stockholders

are entitled to a 6% cumulative dividend, the right to convert to common stock at $1.84,

liquidation rights, and an attached warrant that entitles the holder to purchase common stock at

$1.84.  Moreover, the convertible preferred stock and attached warrants were issued at an

aggregate purchase price of $1.965, which approximated the Company's common stock at the

time, but, since the shares came with a 6% dividend, liquidation rights, warrants and conversion

rights at $1.84, they should have been valued at a price higher than the approximate price of

Forward's common stock at the time.  When McKenna and Forward's auditors engaged on this

issue after the fact, they raised concerns about the value of the convertible preferred shares and

imputed compensation to directors.  An independent valuation analysis further valued the

convertible preferred shares at around $2.77.  However, this issuance of preferred stock was

approved by a special committee consisting of King, Gordon, and Chiste and completed without

McKenna's prior input.  This resulted in a restatement of the Company's 10Q for its fiscal

quarter ended June 30, 2014, as well as in material weakness to Forward's internal controls.

     d.   Despite the fact that the Company's offices are located in Florida, Defendants

also caused the Company to incur a 400% increase in rent payable to Johnson's company in New

York, LaGrange Capital, two months after the initial lease had been agreed to.  The annual rental

payments were escalated from $30,000 to $152,000, for no apparent additional consideration.

McKenna advised against the lease because it was financially irresponsible and exceeded the

budget, but Garrett overrode his recommendation.  Wise and another member of the Board also

voiced their objection to the lease.[3]  The Company's Nominating and Governance Committee, which is comprised of King, Gordon, and Chiste, retroactively approved the amount of this rent increase after it had already been agreed to by Johnson and Garrett and had gone into effect.

e.  In March 2014, Garrett attempted to restrict McKenna from executing a Board approved Sourcing Agreement Renewal.  Specifically, the Board approved renewal of the sourcing agreement with Wise and instructed McKenna to work with the Company's law firm, Olshan Frome Wolosky, LLP ("Olshan"), to incorporate the new terms and execute the agreement.  McKenna ensured that the Board comments were incorporated into the agreement by consulting with Olshan and executed the agreement.  Despite the fact that the sourcing agreement renewal had already been approved by the Board, Garrett attempted to stop execution of the agreement after the fact and severely reprimanded McKenna for executing the agreement when he found out it was too late to stop it.  Garrett implied that the sourcing agreement could have been used as leverage against Wise's complaints against the Board.

f.  From March-August 2014, Garrett instructed McKenna to inform him of any contact he has with Wise and to run any requests by him first.  Most recently, the focus has been on keeping Special Committee items confidential.  However, the special committee mandate is only to discuss and strategize on proxy defense.  Discussions regarding mergers and acquisitions and issuance of convertible preferred stock exceed that mandate and go beyond that mandate and are general Board matters that should not be kept confidential.[4]

---

[3] Indeed, Garrett admitted to McKenna that this lease was nothing more than disguised compensation, meant to ameliorate Johnson after the Board rejected two of his requests to serve as the Company's M&A advisor for a fee.

[4] On May 28, 2014, the Board created a special committee ("Special Committee") consisting of King, Gordon, Chiste, Johnson and Garrett to review and consider potential nominations Wise made to the Board, negotiate with Wise regarding any such nominations, and determine and authorize any agreements with Wise on behalf of the Company related to Wise's potential

g.   From June-August, 2014, McKenna was excluded from the M&A search process even though he submitted guidance and considerations to be discussed at the Board level in an attempt to get an agreement on search/target criteria.  Garrett and Johnson subsequently engaged M&A advisors and conducted a search without McKenna's input or involvement as to strategy or evaluation of targets.  McKenna was further excluded from an imminent transaction on which the Special Committee has engaged an accounting firm to conduct due diligence and was excluded from decisions related to the financing of this transaction, which has been completed.

h.   From June-August, 2014, Garrett prohibited McKenna from making corrective cost cutting actions that were approved by the Board in response to missing budget targets. Forward has missed budget targets in its second and third fiscal quarters and expects to miss budgeted targets for its fourth fiscal quarter, as well as its 2014 fiscal year.  McKenna presented a cost cutting plan to the Board in May 2014 to be enacted if Forward failed to meet its financial and growth targets.  The Board approved the plan.  Garrett prohibited McKenna from proceeding with the plan.

i.   In July, 2014, despite repeatedly notifying Garrett of his desire to remain neutral in the proxy contest, McKenna was named as a "participant in the solicitation of proxies" in a press release by the Company.  Garrett knew that McKenna wanted to remain neutral in the proxy contest and McKenna was never asked and never gave his consent to be named as a participant.  Garrett refused to issue a corrected press release.

j.   Since 2012, Garrett has continuously undermined McKenna's authority as CFO of Forward by circumventing him by seeking financial information and explanations from

---

nomination.  On June 11, 2014, the Board issued a further resolution with respect to the Special Committee, authorizing the Special Committee to analyze ramifications of Wise's nominations and consider and take legal action on behalf of the Company related to Wise's nominations.

McKenna's subordinates.  McKenna has specifically requested that Garrett go through him for all financial reporting and explanations and at least copy him on contact with his subordinates. Garrett has not respected McKenna's wishes and as a result, has disrupted the finance team work flow and put team members in uncomfortable positions.

   k. In July 2014, Garrett advised McKenna, that under several strategic scenarios being considered, including a successful completion of a particular M&A being considered, as well as a desired sale of Forward's current operations, that McKenna's employment would likely be terminated.

**The Special Committee Attempted an Unlawful Dilutive Preferred Stock Issuance and Filed a False Application with NASDAQ under McKenna's Name without his Consent And Retaliated Against Him For Reporting It**

   34. Notwithstanding the expressly limited purpose of the Special Committee, its members have taken a number of unlawful and false and misleading actions in pursuit of a dilutive capital raise prior to the 2014 Annual Meeting to thwart an election of a new slate of independent directors and to entrench Defendants on the Board.

   35. Upon information and belief, on July 7, 2014, the Special Committee held a telephonic meeting, at which its five-members purported to approve the issuance of the 2014 Series B Convertible Preferred Stock, convertible into 1,760,000 shares of common stock, in a private placement at a 10% discount to market value.

   36. In undertaking such unlawful action, the Special Committee exceeded the authority delegated to it by the resolutions of the Board.  The purported approval was also granted without bringing the matter to the prior attention of the full Board or McKenna, the Company's CFO.

37.    On July 9, 2014, McKenna received an email from NASDAQ informing him that the Application to list additional shares of common stock underlying a prospective issuance of convertible preferred stock had been filed with NASDAQ using his credentials on July 8, 2014. Shocked and concerned about the forgery, McKenna sent an email to the full Board informing them of the fraudulent Application.

38.    The Application falsely stated that the proposed issuance had been approved by the Company's full Board on July 7, 2014.  However, the proposed issuance was never approved by the Company's Board.

39.    Even more incredibly, the Application purported to have been filed under McKenna's name, office and initials.  The Application was forged with McKenna's signature affirming the information was correct and accurate.  However, McKenna had no prior knowledge of the Application and had not authorized any third party to use his signature or initials.

40.    After McKenna reported the fraudulent Application to the entire Board, NASDAQ and the auditors, his NASDAQ account was again hacked and his credentials were again used without his permission to withdraw the Application.

41.    McKenna demanded an immediate investigation of the fraudulent Application by the Board.

42.    On July 10, 2014, McKenna spoke with Adam Finerman ("Finerman") of Olshan, the Company's former corporate counsel and current Secretary.  During their call, Finerman admitted to McKenna that he was partly responsible for the filing of the Application, that the Application was filed per the Special Committee's instructions, and that there was "no discussion" about whether the filing would be done using McKenna's name and credentials. Finerman further requested McKenna's assistance in filing a new amended application.

McKenna declined until after the Special Committee completed its investigation and even then he was not sure he could work with Olshan again because of the breach of his trust and fraudulent use of his name.

43.     Five days later, on July 14, 2014, the Company's counsel responded to McKenna's email, stating that "the form was filed in error, and pursuant to Nasdaq procedures was withdrawn on July 9, 2014 once you brought this matter to our attention."

44.     While the July 14 email stated the Application had been withdrawn, it did not state that Defendants would no longer attempt to issue the Series B Preferred Stock and it did not address the Application's false statement that the issuance of the Series B Preferred Stock had been approved by the Board.

45.     Defendants intentionally caused the submission of the falsified and inaccurate Application with NASDAQ on behalf of the Company without the knowledge of the full Board or the CFO.

46.     Moreover, the Special Committee's proposed issuance would have violated NASADAQ Stock Market Rule 5635(d), which requires prior stockholder approval for all transactions (other than public offerings) involving the sale, issuance or potential issuance by a company of common stock (or securities convertible into or exercisable for common stock) equal to 20% or more of the common stock, or 20% or more of the voting power outstanding before the issuance for less than the greater book or market value of the stock.

47.     The Application anticipated the issuance of the 2014 Series B Convertible Preferred Stock, convertible into 1,760,000 shares of common stock.  There are currently 8,195,808 shares of the Company's common stock outstanding.  As such, the proposed issuance would have constituted an issuance of securities convertible into common stock equal to 21.47%

of the Company's outstanding common stock.  Moreover, the Application contemplated that such securities would be offered at less than the greater of book and market value.

48.     Despite the foregoing, no shareholder approval had been obtained in connection with the proposed issuance and the Board had taken no action to call a shareholders' meeting for this purpose in violation of Rule 5635(d).

49.     The Special Committee's proposed stock issuance further violated the Company's governing documents.  The Company's Certificate of Incorporation empowers only the Board to designate and issue preferred stock of any series.  Despite what was set forth on the Application, the issuance of Series B Preferred Stock contemplated therein was never approved by the Board. Further, the Board resolutions forming and empowering the Special Committee do not grant the committee the power to unilaterally designate and issue preferred stock.

50.     Soon after McKenna notified the Board of the fraud, Garrett harassed McKenna for following the Code of Business Conduct and Ethics and reporting the NASDAQ forgery to the Board.  Garrett told McKenna that he and the Board are now "unwilling to share information" with him because there is a "lack of trust" and he is not a member of the team. Moreover, McKenna was threatened by Chiste with the "destruction" of his "professional career" if he should fail to follow Garrett's instructions, regardless of the legality of those instructions.

51.     On August 13, 2014, counsel for McKenna sent a letter to the Special Committee requesting that they provide the authority on which they relied for instructing McKenna to keep certain matters confidential from the Board.  (A true and correct copy of that letter is attached hereto as Exhibit F.)  In that letter, McKenna explained that being required to keep these matters confidential made it impossible for him to adhere to his fiduciary duties the Company and to the Board.

52.     On that same day, McKenna's counsel sent a letter to the members of the Board informing them that McKenna has been instructed by the Special Committee to maintain certain information confidential from the Board and has requested that the Special Committee provide him with the authority on which they relied to keep those matters confidential.  (A true and correct copy of that letter is attached hereto as Exhibit G.)

**The Company Retaliates Against McKenna For Refusing To Sign A Knowingly False Auditor's Representation Letter**

53.     The Company's Form 10Q was due to be filed on August 19, 2014.  In July, 2014, McKenna was asked to verify certain representations in a letter of representations required by Forward's audit firm to certify the Company's Form 10-Q.  However, McKenna could not verify the letter of representations due to his knowledge and suspicion of unethical and fraudulent activity by Defendants, including but not limited to the fraudulent Application.  McKenna brought this to John Chiste's and the auditor's attention and offered to work with the auditors to come up with a version that was truthful so it could be verified by McKenna before the filing deadline.  The offer was ignored.[5]

54.     Instead, McKenna was assured that the Audit Committee – comprised solely of Defendants – engaged Friedman Kaplan Seiler & Adelman LLP ("Friedman") to conduct an independent investigation of the fraudulent Application.  Defendants' counsel further assured McKenna that Friedman had completed its investigation and reported to the Audit Committee that there was no fraud or any other illegal activity in connection with the Application.  The Company, through its counsel, requested that McKenna sign the auditor's representation letter and proceed with filing the Company's Form 10Q for the period ended June 30, 2014.

[5] Moreover, on August 19, 2014, McKenna became aware of communications with the SEC when he discovered it in a bill.  In the last version of the auditor's letter, McKenna was asked to represent that there had been no communications with the SEC.

55.    However, the investigation by Friedman, led by Mary Mulligan ("Mulligan") was solely aimed at arriving at the determination of no fraud.  Mulligan made it abundantly clear that she was only interested in the filing of the Application with NASDAQ and when McKenna attempted to provide additional information, or otherwise highlight the financial lack of controls, Mulligan refused to engage in such conversation.  Accordingly, Mulligan's so-called investigation failed to address many other aspects of the issues related to the auditor's representation letter and actions by Defendants.  Accordingly, it was impossible for the investigation to conclude no fraud and clear the totality of the concerns raised by McKenna since a majority of the issues were not discussed, investigated, or even questioned.

56.    McKenna raised his concerns almost a month prior to the supposed investigation and it was only on August 18, 2014, the day before the deadline to submit the Company's Form 10Q, that his concerns were purportedly addressed in a single interview that lasted approximately one hour with only one issue addressed.

57.    At that point, it was clear that the Company was acting upon its threats to retaliate against McKenna for adhering to his fiduciary obligations and stalled on addressing his concerns to craft a circumstance to seek to terminate him.  Indeed, McKenna was directly and unambiguously threatened with "costly" and "devastating" litigation that would "destroy" his career if he refused to do as told by Defendants.[6]

58.    The next day, on August 19, 2014, McKenna was wrongfully terminated in retaliation for adhering to his fiduciary obligations and, purportedly, for refusing to sign

---

[6] These threats were made by Chiste to McKenna on two separate occasions.  The first was when McKenna engaged counsel.  At that point, Chiste threatened the destruction of McKenna's career if he pursued legal action.  The second occasion was after an Audit Committee meeting on August 11, 2014, where McKenna had raised concerns about signing the representation letter.  Chiste made threats to McKenna at that point in an effort to strong arm him into signing the letter.  Specifically, Chiste threatened that Johnson would fire McKenna for delaying the filing of the Company's Form 10Q and causing destruction of shareholder value because the Company could not then file a Form S3 for the 2014 Convertible Preferred Stock placement and would be forced to file a Form S-1.

Forward's Form 10Q for the period ended June 30, 2014.  However, as set forth above, McKenna refused to sign the Form 10Q because to do so would have been to fraudulently affirm the Auditor's representation letter.  Despite Defendants' threatening and bullying tactics, McKenna refused to be bullied into committing fraud by executing a knowingly false auditor's representation letter.

## FIRST CLAIM

### (Retaliation for Whistleblowing Pursuant to the Dodd-Frank Act – against the Company)

59.    McKenna repeats and realleges the allegations set forth in Paragraphs 1-57 above as fully and completely as if set forth herein at length.

60.    On July 9, 2014, McKenna learned that his NASDAQ account had been hacked and an Application for additional shares had been fraudulently submitted under his name, with his forged signature.  As strongly encouraged by federal and state law, and by the Company's own internal policies, McKenna notified the Board of the alleged fraudulent Application.

61.    Although Section 16 of the Company's Code categorically required McKenna to report that information to any of a number of designated personnel, when he did just that, he was retaliated against and harassed for reporting the forged Application and ultimately terminated for refusing to affirm fraudulent representations in a Form 10Q.

62.    Section 922(a) of the Dodd-Frank Act prohibits an employer from, inter alia, discharging an employee for making any disclosure that is required or protected by SOX, the Securities Exchange Act of 1934, U.S.C. §§ 78a et seq., including section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of title 18, United States Code, and any other law, rule or regulation subject to the jurisdiction of the Securities and Exchange Commission.  Pursuant to 18 U.S.C. § 1514, among the information disclosures protected by SOX is information that the

employee reasonably believes constitutes mail fraud, wire fraud, bank fraud or securities fraud; or a violation of any rule or regulation of the Securities and Exchange Commission; or any provision of Federal law relating to fraud against shareholders.

63.     Defendant is covered by SOX because it (a) has a class of securities registered under section 12 of the Securities and Exchange Act of 1934 (15 U.S.C. 78l); and (b) it "is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d))."  18 U.S.C. 1514A(a).

64.     McKenna engaged in activity protected by Section 806 of SOX (18 U.S.C. 1514A) when he disclosed the forged Application and the inaccurate representations in the auditors letter for the Company's Form 10Q.

65.     The disclosures McKenna made to the Board regarding the forged Application and the inaccurate representations in the auditor's letter for the Company's Form 10Q were protected under the Dodd-Frank Act and SOX.

66.     The Company terminated McKenna's employment in retaliation for notifying the Board of the alleged illegal and unethical activity.

67.     The Company's actions were intentional and made with reckless indifference to McKenna's rights and sensibilities.

68.     By reason of the foregoing, the Company has violated 15 U.S.C. 78u-6(h)(1)(B) thereby causing McKenna damages pursuant to statute to be proven at trial.

## SECOND CLAIM

### (Breach of Contract – against the Company)

69.     McKenna repeats and realleges the allegations set forth in Paragraphs 1-67 above as fully and completely as if set forth herein at length.

70.     The Company breached its Employment Agreement with McKenna by purporting to terminate McKenna's employment "for cause" when in fact no such "cause" existed, either as that term is defined in the Employment Agreement or otherwise.

71.     McKenna fully and faithfully performed his own obligations under the Employment Agreement with the Company.

72.     As a direct, proximate and foreseeable result of the Company's breach of the Employment Agreement, McKenna has suffered injury and damages, including without limitation, loss of earnings for 2014 in an amount to be proven at trial.  Other damages include the loss of employment benefits, damage to his professional reputation, including without limitation diminished earning capacity.  In addition, the Company should be required to pay McKenna the value of all vested stock awards that were or should have been awarded to him as part of his Employment Agreement and any subsequent compensation awards to which he was or would have been entitled if he had not been wrongfully terminated, and the Company should be required to return the monetary value of any such awards that it improperly confiscated from him based on the false characterization that McKenna's employment was terminated for "cause."

### THIRD CLAIM

### <u>(Breach of Covenant of Good Faith and Fair Dealing – against the Company)</u>

73.     McKenna repeats and realleges the allegations set forth in Paragraphs 1-71 above as fully and completely as if set forth herein at length.

74.     It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Defendants' obvious and blatant bad faith and wrongdoing, Defendants have breached their duties of good faith and fair dealing.

75.     Specifically, Defendants, on behalf of the Company, have been pursuing a ruinous course of underhanded and reckless corporate action, including a number of questionable related-party transactions involving insider Defendants, including, but not limited to, improper conduct by the individual defendants relating to a pending imminent acquisition with a third party which defendants have failed, and continue to fail, to disclose despite a duty to do so, all of which was undertaken against the advice of McKenna, or without informing him.  McKenna has made numerous attempts to discuss these matters with the CEO and Board but has been rebuffed every step of the way.

76.     Due to the bad faith conduct of the Company, punitive damages should be assessed so that they are deterred from attempting such harmful employment practices in the future.

77.     As a direct result of the Company's actions, McKenna has suffered damages, including consequential damages, in an amount to be determined at trial.

## FOURTH CLAIM

### (Tortious Interference with Contract – against the Individual Defendants)

78.     McKenna repeats and realleges the allegations set forth in Paragraphs 1-76 above as fully and completely as if set forth herein at length.

79.     The Individual Defendants knew that a valid and binding employment agreement existed between McKenna and the Company.

80.     The Individual Defendants wrongfully, intentionally and with malice towards McKenna interfered with this contract by harassing and terminating McKenna in retaliation for reporting alleged illegal and unethical behavior by the Individual Defendants and for refusing to affirm fraudulent representations in connection with the Company's Form 10Q.

81.     As a direct result of the Individual Defendants' wrongful actions, McKenna has suffered damages, including punitive damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff James McKenna seeks judgment in his favor and against Defendants as follows:

(i) On his First Claim, under the Dodd-Frank Act, based on retaliation for whistleblowing, damages in an amount to be determined at trial, including two (2) times the amount of back pay otherwise owed to him, with interest on that amount and compensation for litigation costs, expert witness fees, and reasonable attorneys' fees;

(ii) On his Second Claim, for wrongful discharge in breach of contract, damages in an amount to be determined at trial for lost wages for 2014, plus additional damages in an amount to be proven at trial to compensate him for the loss of employment benefits, damage to his professional reputation, including without limitation diminished earning capacity, and damages for the monetary value of all vested stock awards that were or should have been awarded to him as part of his employment agreement and any subsequent compensation awards to which he would have been or was entitled if he had not been wrongfully terminated, and the Company should be required to return to McKenna the monetary value of any such awards that it may improperly have confiscated based on its false characterization that McKenna's employment was terminated for "cause;"

(iii) On his Third Claim, for breach of the covenant of good faith and fair dealing, for damages, including consequential and punitive damages, in an amount to be proven at trial;

(iv) On his Fourth Claim, for tortuous interference with contract, for damages, including consequential and punitive damages, in an amount to be proven at trial; and

(v) For such further relief as the Court deems just and proper.

Dated:   New York, New York          **MICHELMAN & ROBINSON, LLP**
        August 26, 2014


By:   /S/ Robert D. Piliero
     Robert D. Piliero
     800 Third Avenue, 24th Floor
     New York, New York 10022
     Telephone:  (212) 730-7000

*Attorneys for Plaintiff James McKenna*